United States District Court
Southern District of Texas
**ENTERED**
September 13, 2023
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | | |
|---|---|---|
| BEATRICE VALLEJO, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 7:22-CV-193 |
| | § | |
| KILOLO KIJAKAZI, | § | |
| | § | |
| Defendant. | § | |

## REPORT AND RECOMMENDATION

Plaintiff Beatrice Vallejo, proceeding with retained counsel, filed this action pursuant to

42 U.S.C. § 405(g), seeking review of the Commissioner of Social Security's denial of disability

benefits.  Plaintiff's application alleged that she became disabled in 2019 due to a myriad of

physical and mental ailments; including anxiety, depression, osteoporosis, rheumatoid arthritis,

and high blood pressure.  (*See* Tr. 264, 317.)[1]  An Administrative Law Judge (ALJ) found that,

while some of Plaintiff's physical and mental conditions limited her to a restricted range of

medium work, she is still capable of performing jobs that exist in significant numbers, and thus

she is not disabled.

In challenging the Commissioner's denial of benefits, Plaintiff alleges that the ALJ erred

in the following three ways: 1) the "ALJ's [physical] RFC assessment is void of any articulated

evidentiary foundation"; 2) the "ALJ failed to reconcile her [mental] RFC assessment with her

psychiatric review technique findings [she] made at Step 3"; and 3) by improperly relying "on

---

[1] The Commissioner has filed a transcript of the record of the administrative proceedings
(Docket No. 9), which will be cited as "Tr."  The specific page of the administrative transcript will
be cited by reference to the page numbers in bold typeface located in the bottom right corner of
the transcript pages.

vocational expert testimony containing an unresolved conflict." (Docket No. 11, at 1.)  Pending before the Court are the parties' cross motions for summary judgment.  (Docket Nos. 11, 14.)

A federal court may review the Commissioner's denial of benefits only to determine whether it is supported by substantial evidence and whether the proper legal standards were applied; a court may not re-weigh the evidence or substitute its judgment for the Commissioner's. *Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002).   After carefully considering the record in light of the deferential standard of review that applies, the undersigned concludes that Plaintiff's claim lacks merit.

The record shows that the ALJ's careful and thorough written opinion shows that she did not commit reversible error in her physical and mental RFC determination, which is supported by substantial evidence.  In addition, the ALJ did not commit reversible error in her reliance on the vocational expert's testimony to support her finding that Plaintiff is able to perform work that exists in significant numbers in the national economy.  Accordingly, for the reasons discussed further below, it is recommended that Plaintiff's summary judgment motion be denied, that the Commissioner's motion be granted, that the Commissioner's decision be affirmed, and that this action be dismissed.

## I.  BACKGROUND

In May 2020, Plaintiff applied for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under sections 216(i) and 223 of Title II of the Social Security Act, 42 U.S.C. §§ 401 et seq., and section 1614(a)(3)(A) of Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-83f, respectively.  (*See* Tr. 52, 59, 99, 264.)  In her application, Plaintiff alleged that she became disabled on May 1, 2019; however, she later amended her alleged onset date to January 1, 2020.  (Tr. 44, 264.)  She identified anxiety, depression, osteoporosis, rheumatoid arthritis, and

2

high blood pressure as the conditions that prevented her from working.  (*See* Tr. 264, 317.)
Plaintiff's applications were denied initially and on reconsideration. (Tr. 66-67, 94-95.) Plaintiff
then requested a hearing before an ALJ, which was held on October 26, 2021. (Tr. 22, 134.) The
ALJ issued a written decision on December 13, 2021, finding that Plaintiff was not disabled
because she was able to perform a restricted range of medium work that included jobs existing in
significant numbers in the national economy. (Tr. 99-109.)

Plaintiff filed a request with the Social Security Administration's Appeals Council to
review the ALJ's adverse decision.  The Appeals Council denied review, rendering the ALJ's
decision the Commissioner's final decision for purposes of judicial review. (Tr. 1.) In considering
Plaintiff's challenge to the ALJ's decision, the evidence in the record will be summarized.[2]

## A.      Education, Work Experience, and Activities

At the time of the administrative decision, Plaintiff was 54 years old.  (*See* Tr. 109, 264.)
Plaintiff can read, write, and understand English, but only completed her education up to the 9th
grade. (Tr. 33, 316.)  Plaintiff's past work experience has varied; however, most recently her
employment included working as a home health provider and an "envelope stuffer." (Tr. 288,
324.) Going back to 2002, Plaintiff's most consistent employment was as a home health provider.
(Tr. 288, 318.)   Her duties included preparing meals, doing laundry, cleaning the home, and
assisting the client with transferring. (Tr. 295, 318.)  In doing this, she frequently lifted more than
50 pounds and walked and/or stood for up to three hours per day. (Tr. 295, 319.) As an envelope

---

[2] The Court must "scrutinize" the record to determine whether the ALJ's decision is
supported by substantial evidence. *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988).  The
undersigned has thoroughly reviewed the medical records and other evidence, which will be
summarized above.

stuffer (2013-2018), Plaintiff frequently lifted boxes weighing more than 50 pounds, sat for four hours each day, and stood for two hours each day. (Tr. 326.)

Plaintiff lives alone. (Tr. 349.) When she filed her disability application, she described her "illnesses, injuries, or conditions" as follows:

> Well due that I have osteoporosis on my spine I can't carry or lift and due to the arthritis in my hands I have a hard time holding on to things or carrying things. [M]y job as a provider requires preparation of things as to sweeping, mopping, [and] changing the patient and bathing.

(Tr. 349.) As a provider, Plaintiff is tasked with taking care of her elderly mother. (Tr. 350.) Plaintiff's mother is bedridden, so she does everything for her, including changing her, feeding her, and cleaning her house. (Tr. 350, 356.) Plaintiff's condition causes her pain and affects her ability to take care of her own personal care, but she is able to complete her activities of daily living. (Tr. 350.)

Plaintiff "need[s] to be reminded to shower, eat, and take medications." (Tr. 351.) She can prepare simple meals. (*Id.*) Plaintiff also does her own laundry but "it's a strain" and mopping and sweeping "is painful." (*Id.*) Plaintiff no longer does any yard work. (Tr. 352.) Plaintiff's osteoporosis makes it painful for her to lift, squat, bend, stand, walk, sit, kneel, and climb stairs. (Tr. 354.) She is only able to walk a "1/2 block" before requiring a rest break. (*Id.*)

Plaintiff continues to drive but it scares her. (Tr. 352-53.) She goes outside daily and is able to run errands. (Tr. 352.) Plaintiff does her own grocery shopping and picks up her prescriptions. (*Id.*) She also handles her own finances. (*Id.*) Plaintiff reads daily but does not pursue other hobbies due to her pain and anxiety. (Tr. 353.) As to her social interests, she visits family members daily. (*Id.*)

Other than visiting family, Plaintiff's anxiety keeps her from interacting with others. (Tr. 354.) Plaintiff's "depression is so intense that just to get out of the house is a struggle." (Tr. 352.)

Her "pain, stress, anxiety, [and] bipolar depression" affects her sleep.  (Tr. 350.)  According to

Plaintiff, her depression and anxiety affects her memory and her ability to complete tasks,

concentrate, understand, follow instructions, and get along with others.  (Tr. 354.)  She does not

handle stress well, and "everything stresses [her] out."  (Tr. 355.)  Plaintiff frequently prefers to

be alone and is fearful of "hurting someone emotionally."  (*Id.*)  On the other hand, she gets along

well with "authority figures" and has "never had a confrontation with them."  (*Id.*)

**B.      The Medical Evidence**

Plaintiff's medical records date back to 2017.  (*See, e.g.*, Tr. 478, 678, 748, 1003.)

Although Plaintiff originally alleged that her onset disability date was in May of 2019, she now

alleges that she has been unable to work since January 1, 2020.  To be sure, Plaintiff's medical

history reflects a myriad of both physical and mental ailments.  In fact, in her disability application

she identified anxiety, depression, osteoporosis, rheumatoid arthritis, and high blood pressure as

the conditions that prevented her from working.  This summary of the medical evidence will focus

on those impairments that are relevant to Plaintiff's application for disability benefits and, more

specifically, to those impairments that are most relevant to her alleged points of error.

1.      Physical Impairments

As noted, Plaintiff's medical records begin on January 18, 2017, when she presented to the

Elsa Medical Clinic complaining of headaches as a result of sinus problems.[3]  (Tr. 478.)  "The

severity of the sinus problem [was] moderate and [was] rated 7/10 on the pain scale."  (*Id.*)

Plaintiff has complained of symptoms relating to her sinuses numerous times at the Elsa Medical

---

[3] In fact, the majority of the medical records are from the Elsa Medical Clinic and are contained in Exhibits 5F and 7F.  (*See* Tr. 452-714, 719-1043.)  However, upon closer review Exhibit 7F is largely comprised of duplicate records from Exhibit 5F.  (*Compare* Tr. 452-714, *with* Tr. 719-1043.)

Clinic.[4]  (*See, e.g.*, Tr. 580, 631, 653, 658, 661, 678.)  However, her sinus issues appear to be relatively minor, based on her subjective complaints.  (*See, e.g.*, Tr. 478, 580.)

Plaintiff continued to visit the Elsa Medical Clinic throughout 2017, presenting there on approximately eleven occasions.  (Tr. 478, 597, 594, 591, 589, 586, 582, 491, 481, 580, 576.)  During these visits she complained of sinus problems (Tr. 478, 580), joint pain (Tr. 594), abdominal pain (Tr. 591), vomiting (Tr. 589), chest pain (Tr. 586), feet swelling (Tr. 582), and migraines (Tr. 481, 491).[5]  On November 27, 2017, Plaintiff underwent an "Annual Wellness" exam, at which time Dr. Jorge Martinez determined her "general health status" to be "fair."  (Tr. 576-77.)

In 2018, Plaintiff returned to the Elsa Medical Clinic approximately thirteen times.  (Tr. 574, 571, 569, 565, 562, 560, 557, 554, 550, 510, 547, 545, 543.)  During these visits she complained of abdominal pain (Tr. 574, 545), sore throat (Tr. 571, 550, 547, 543), back pain (Tr. 569), headaches (Tr. 569, 1170), fatigue (Tr. 565), nasal congestion (Tr. 562), dysuria (Tr. 560), and joint pain (Tr. 554, 510).  However, most of her subjective complaints were "mild."  (*See* Tr. 574, 569, 560, 554, 551, 510, 548, 545, 543.)  On August 9, 2018, Plaintiff underwent a scan of lumbar spine and left hip.  (Tr. 704.)  The scan revealed "osteoporosis [of her] lumbar spine" and

---

[4] As noted, the majority of Plaintiff's medical records are from the Elsa Medical Clinic, and those records reflect that Plaintiff has visited the clinic dozens of times.  The Elsa Medical Clinic has treated Plaintiff's physical impairments, including sinus issues, headaches, dysuria, foot problems, joint pain, abdominal pain, hypertension, shortness of breath, rashes, sore throat, pneumonia, back pain, chest pain, vomiting, and hand/finger problems.  (*See, e.g.*, Tr. 478, 481, 506, 510, 519, 522, 530, 533, 543, 554, 566, 569, 586, 589.)

[5] Due to "upper back pain," on November 14, 2017, Plaintiff underwent an x-ray of her thoracic spine.  (Tr. 708.)  The procedure involved "2 views of the thoracic spine" and showed no fractures, "preserved" vertebral body heights and disc space heights, and was otherwise "normal."  (*Id.*)

"osteopenia [of her] left hip." (*Id.*)  She has also undergone colonoscopies which have revealed "diverticulosis of [her] colon." (Tr. 683, 1148, 1194.)

Plaintiff continued to present to the Elsa Medical Clinic in 2019, presenting approximately seven times.[6]  During these visits she complained of headaches (Tr. 540), dysuria (Tr. 536, 506), foot pain (Tr. 507), abdominal pain (Tr. 519), hypertension (Tr. 533), and a rash (Tr. 533).  On June 19, 2019, Plaintiff underwent an "Annual Wellness" exam which was performed by Martin Rocha, PA-C.  (Tr. 502.)  Although Plaintiff was experiencing a migraine during the visit, Mr. Rocha determined her "general health status" to be "good." (*Id.*)  While at the Elsa Medical Clinic in 2019, most of her subjective complaints were again "mild" or "moderate" in nature.  (*See* Tr. 540, 537, 506, 517, 534.)

On January 4, 2019, Plaintiff presented to Elvin R. Garcia, M.D., for an initial consultation regarding "severe joint pain." (Tr. 434.)  She complained of pain in her "hand, knee, and toe," but primarily her concern was of the pain in her left hand.  (*Id.*)  The pain on her left hand was "constant, moderate in intensity, [ ] aching," and an 8/10.  (*Id.*)  Plaintiff stated that "[s]he has not found anything that relieves the pain." (*Id.*)  Upon examination, her musculoskeletal system was positive for "arthralgias, joint stiffness and myalgias." (*Id.*)  Dr. Garcia diagnosed Plaintiff with "reactive arthritis" and ordered X-rays of both of Plaintiff's hands and wrists.  (Tr. 435-36.)  He also noted Plaintiff's "chronic recurrent sore throat." (Tr. 434, 447.)

Plaintiff returned to Dr. Garcia in May and October of 2019 with similar complaints.  (Tr. 438-46.)  She was experiencing joint pains in her fingers, toes, shoulders, and knees.  (Tr. 438, 442.).  Plaintiff described her discomfort as "mild or transient" and/or moderate in intensity.  (Id.)

---

[6] In 2019 and 2020, Plaintiff underwent mammogram screenings which found "no suspicious masses" and "no evidence of malignancy." (Tr. 710, 1151, 1200.)

Dr. Garcia noted her history of osteoarthritis, and his physical exam revealed her to be "positive for arthralgias, joint stiffness, back pain and myalgias." (*Id.*)

In 2020, Plaintiff returned to the Elsa Medical Clinic approximately thirteen times. (Tr. 530, 527, 525, 522, 821, 816, 811, 787, 807, 804, 801, 798, 795.) During these visits she complained of hypertension (Tr. 530, 522, 821, 816, 812, 804, 801, 795), shortness of breath (Tr. 530), dysuria (Tr. 527, 525, 821, 787, 798), abdominal pain (Tr. 807, 804), insomnia (Tr. 804), and back pain (Tr. 801). During these visits, she described her subjective complaints as "moderate." (Tr. 530, 528, 525, 523, 821, 817, 812, 787, 808, 804, 801, 799, 796.) On August 27, 2020, Plaintiff underwent an "Annual Wellness" exam which was performed by Ricardo Salinas, PA. (Tr. 816). During the exam, Plaintiff continued to complain of hypertension. (Tr. 817.) Mr. Salinas noted that Plaintiff was non-compliant "with medications and with weight management." (*Id.*) Overall, he determined her "general health status" to be "fair." (*Id.*)

In 2020, Plaintiff also returned to Dr. Garcia for treatment. (Tr. 447, 715.) She complained of "diffuse joint aches," predominantly in her left hand. (*Id.*) The intensity of her pain ranged from mild to moderate. (*Id.*) Dr. Garcia diagnosed her with "reactive arthritis," which he noted was aggravated by "movement in general." (Tr. 715.) However, Plaintiff's stated that her symptoms were "relieved with NSAIDs." (*Id.*)

On October 16, 2020, a state agency physician, Dr. Tom Dees, reviewed Plaintiff's medical records and evaluated her ability to perform work related functions (residual functional capacity (RFC) assessment.) (Tr. 52-58.) Dr. Dees determined that Plaintiff's "essential hypertension" was a "severe" impairment. (Tr. 55.) However, at that time Dr. Dees determined that "[t]here [was] insufficient evidence to evaluate the claim." (Tr. 56.) As such, Dr. Dees did not complete an RFC assessment for Plaintiff. (Tr. 57 ("No RFC/MRFC assessments are associated with this claim.").)

8

Dr. Dees concluded that the evidence of record only "partially support [Plaintiff's] allegation limitations." (Tr. 55.)

On March 3, 2021, another state agency physician, Dr. George Carrion, reviewed the evidence of record, which included additional medical records. (*Compare* Tr. 53-54, *with* Tr. 71-73.) Dr. Carrion determined that Plaintiff's "essential hypertension" and "osteoarthritis" were "non severe" impairments. (Tr. 76.) Dr. Carrion also did not complete an RFC assessment for Plaintiff. (Tr. 79 ("No RFC/MRFC assessments are associated with this claim.").) Likewise, Dr. Carrion concluded that Plaintiff's "allegations are [only] partially consistent" with the medical evidence of record. (Tr. 75.) Finally, Dr. Carrion agreed with Dr. Dees's assessment that the medical evidence of record showed that Plaintiff was "not disabled." (*Compare* Tr. 57, *with* Tr. 79.)

On May 12, 2021, Elvin R. Garcia, M.D., performed a "Physical Assessment" of Plaintiff's abilities. (Tr. 1114-15.) In his opinion, Plaintiff's symptoms were severe enough to "constantly . . . interfere with the attention & concentration required to perform simple work-related tasks." (Tr. 1114.) Dr. Garcia determined that Plaintiff could walk without rest for "1/2 of [a] block," and sit, stand, and walk for up to one hour per eight-hour workday. (*Id.*) She could occasionally lift objects weighing less than 10 pounds, but never anything weighing more. (*Id.*) In addition, Plaintiff was only able to use her upper extremities 30% of the day. (*Id.*)

According to him, Plaintiff would need to be absent from work "three or four times a month" as a result of her impairments. (Tr. 1115.) Ultimately, Dr. Garcia diagnosed Plaintiff with "reactive arthropathy, arthralgic, osteoporosis of spinal cord." (Tr. 1114.)

Plaintiff continued to seek treatment from the Elsa Medical Clinic in 2021. (Tr. 1132, 1126, 1122.) She complained of hypertension and edema in both of her lower legs. (*Id.*) She

described her symptoms to be "moderate." (*Id.*)  Plaintiff stated that her hypertension was relieved by medication; however, she also acknowledged missing medication and being non-compliant with her diet.  (Tr. 1122, 1132.)  Her lower leg edema was also relieved when she elevated the affected areas.  (Tr. 1126.)  On July 21, 2021, Plaintiff returned to Dr. Garcia, complaining of "bilateral hand and feet pain."  (Tr. 1117.)  Dr. Garcia noted her diagnosis of "reactive arthritis," but also acknowledged that her symptoms were "mild" and "relieved with NSAIDs."  (*Id.*)

2.   Mental Health Issues

As noted, Plaintiff alleges that depression and anxiety are the two primary mental health conditions that prevent her from working.  As far back as February 2017, Plaintiff asserted while at the Elsa Medical Clinic that "she has problems with recurrent anxiety."  (Tr. 597.)  Although her history of anxiety and depression was noted (*see, e.g.*, Tr. 595, 586, 583, 491, 481, 569, 566), Plaintiff did not complain of mental health symptoms until June 27, 2018 (Tr. 562).  She described her anxiety as "difficulty concentrating, feeling of fear, nervousness and restlessness."  (*Id.*)  "The severity of the anxiety is moderate," "episodic," and "has lasted for 3 months."  (*Id.*)  It is also exacerbated by "missed medication."  (*Id.*)  Notwithstanding her symptoms, she appeared alert and oriented, in "no acute distress," and she displayed "appropriate mood and affect."  (Tr. 564.)

The next month (July 2018), Plaintiff described improving anxiety symptoms ("mild") and stated that she was "feeling much better" after her medication was adjusted.  (Tr. 557, 560.)  On October 16, 2018, Plaintiff complained of depressive symptoms, including irritability.  (Tr. 510.)  Her symptoms were "mild," "episodic," and "improving."  (*Id.*)  She also explained that medication was helping to relieve her symptoms of both depression and anxiety.  (*Id.*)

In May 2019, Plaintiff again described "mild" anxiety symptoms while at the Elsa Medical Clinic.  (Tr. 537.)  She reiterated that medication was helping to relieve her symptoms.  (*Id.*)  In

10

June 2019 she experienced increased depression due to her mother's health declining.  (Tr. 502.)
The severity of her anxiety increased to "moderate" in October 2019, due to "emotional stress."
(Tr. 517.)  However, she continued to exhibit "no acute distress."  (Tr. 518.)  In fact, Plaintiff
returned to the Elsa Medical Clinic approximately thirteen times in 2020; however, those visits
were devoid of depression and/or anxiety symptoms.  (*See* Tr. 530, 527, 525, 522, 821, 816, 811,
787, 807, 804, 801, 798, 795.)  Similarly, during her visits at the Elsa Medical Clinic in 2021,
Plaintiff did not complain of experiencing any symptoms of anxiety or depression.[7]  (Tr. 1132,
1126, 1122.)

It appears that Plaintiff has sought repeated treatment for her mental health issues from
Belen Laqui Ramos, PA-C.  Ms. Ramos began treating Plaintiff on August 9, 2019.  (Tr. 1047.)
Ms. Ramos continued to treat Plaintiff throughout 2019 (five visits), 2020 (eight visits), and 2021
(four visits).  At her "new patient evaluation," Plaintiff explained that "she had been depressed
since she was 20 yo," but her "first episode of anxiety" did not manifest until she was in her "40s."
(Tr. 1047, 1049.)  Her depressive symptoms include loss of energy, crying spells, irritability,
isolation, sadness, difficulty sleeping, and concentration difficulties.  (Tr. 1048.)  Her anxiety
symptoms include apprehensiveness, shortness of breath, excessive worrying, trembling,
concentration difficulties, and increased heart rate.  (Tr. 1048-49.)  The severity of her depression
and anxiety was assessed as "moderate."  (*Id.*)

On August 9, 2019, Plaintiff showed "signs of moderate depression," "no signs of anxiety,"
and numerous appropriate and intact mental status findings.  (Tr. 1052 (normal speech, intact

---

[7] Notably, each time Plaintiff presented to Dr. Elvin Garcia, which was on three occasions
in 2019, twice in 2020, and once in 2021, she was "negative for anxiety, depression, and sleep
disturbances."  (Tr. 434, 438, 442, 447, 715, 1118-19.)  She also exhibited "no apparent distress,"
"appropriate affect and demeanor," and she appeared alert and oriented.  (Tr. 436, 440, 444, 449,
717, 1119.)

language skills, appropriate affect, intact associations, intact cognitive functioning, and fully oriented).) During 2019, Plaintiff continued to complain of depression (Tr. 1061, 1065, 1069) and anxiety (Tr. 1056, 1065) to Ms. Ramos. Upon examination, Ms. Ramos found "her to have no apparent serious mental status abnormalities" (Tr. 1058, 1067) and "no apparent signs of anxiety" (Tr. 1058, 1063, 1067). Her examinations did show signs of depression (Tr. 1058, 1063, 1070) in addition to appropriate and intact mental status findings (Tr. 1058, 1063, 1067, 1070).

As noted, in 2020 Plaintiff returned to Ms. Ramos eight times. As to her subjective complaints, she asserted at various visits that her symptoms of anxiety (Tr. 1073, 1077, 1095, 1099, 1104, 1108) and depression (Tr. 1073, 1077, 1083, 1089, 1099) have continued. At other times, she stated that her symptoms were either not present, improving, and/or that her medications were helping her. (Tr. 1073, 1083, 1095, 1104, 1108.) Upon examination, Ms. Ramos displayed "mental status [with] no gross abnormalities," "no signs of depression," and "no signs of anxiety." (Tr. 1075, 1085, 1091, 1095, 1105, 1108.) She also repeatedly shows intact and/or appropriate mental status findings. (Tr. 1075, 1085, 1091, 1095, 1101, 1105, 1108.)

Beginning in October of 2020, the state agency psychological/psychiatric medical experts, Dr. Sheri L. Tomak, Psy. D., and Dr. Mack Stephenson, Ph.D., reviewed Plaintiff's medical records. (Tr. 52-58, 68-80.) Dr. Tomak determined that Plaintiff's "depressive, bipolar and related disorders" were severe; however, she found that there was "insufficient evidence" to evaluate her ability to understand information, interact with others, concentrate, and manage oneself. (Tr. 55-56.) In contrast, Dr. Stephenson determined that Plaintiff's "depressive, bipolar and related disorders" and "anxiety and obsessive-compulsive disorders" were "non severe." (Tr. 76.) After reviewing the medical evidence, Dr. Stephenson found that Plaintiff had no deficits in her ability to understand information or manage oneself. (Tr. 76.) As to her ability to interact with others

and to concentrate, she found that Plaintiff had mild deficits.  (*Id.*)  As such, both Drs. Tomak and Stephenson found that Plaintiff was "not disabled" and they determined that a mental RFC assessment of Plaintiff was unnecessary.  (Tr. 57, 79.)

Plaintiff returned to Ms. Ramos for treatment four times in 2021.  Notably, on February 11, 2021, she stated that she was feeling "better," and she denied experiencing anxiety or depression.  (Tr. 1154.)  In May, July, and October of 2021 she relayed that her symptoms of anxiety and depression have continued.  (Tr. 1159, 1164, 1206.)  Her examinations revealed signs of anxiety (Tr. 1160) and depression (Tr. 1160, 1165, 1206) during some of these visits.  On the other hand, Ms. Ramos noted that Plaintiff's "mental status has no gross abnormalities" (Tr. 1206), and again, determined her to have numerous intact and/or appropriate mental status findings.  (Tr. 1154, 1160, 1165, 1206.)

On May 11, 2021, Belen Ramos, PA-C, performed a "Mental Capacity Assessment" of Plaintiff.  (Tr. 1111-13.)  Ms. Ramos found that Plaintiff had "mild" limitation her ability to initiate and perform tasks that she already knows how to do.  (Tr. 1112.)  However, she determined that Plaintiff was moderately or markedly limited in most of her abilities, including: 1) understanding, remembering or applying information; 2) concentration, persistence, or maintaining pace; 3) adapting or managing oneself; and 4) interacting with others.  (Tr. 1111-13.)  Specifically, Ms. Ramos concluded that Plaintiff's abilities were markedly limited in the following:

- Ability to use reason and judgment;

- Work a full day without needing additional rest periods;

- Manage psychologically based symptoms;

- Make plans independently of others;

- Handle conflicts with others; and

- Keep social interactions free from excessive irritability.

(*Id.*) Ms. Belen based her assessment on "observations [and] direct questioning" of Plaintiff. (Tr. 1113.)

## C.    The Evidentiary Hearing

The ALJ held the evidentiary hearing on October November 26, 2021.[8] (Tr. 22-51.) Two witnesses testified: Plaintiff and a vocational expert, Diana Kizer.[9] Plaintiff was represented at the hearing by her attorney, Brooks Hughes.[10] She was 54 years old at the time of the hearing. (Tr. 30.) In response to the ALJ, Plaintiff summarized the reasons she applied for disability as follows:

> Since I was working as a provider, I've always worked as a provider. Well, during that time, I mean, it was unbearable. I mean, I wasn't able to pick up the patient. My hands started tingling. I just started hurting. I wasn't able to [ ] as I used to, to pick him up, to take him a bath and all that. And then since I also have like three herniated discs in my lower back, I mean, that took a toll on me, also. And since I also have osteoporosis on my thigh, I mean, that was something that was really hard to take care of the patient. And I also have foot problems. My feet hurt a lot. There's times where I can't bear the pain and that's when it started. So, that's when I think that's when I started seeing Dr. Garcia, the specialist for arthritis and all that. That's where it started.

(Tr. 30.) She explained that her daughter helps her with her "medications and taking [her] to the doctor." (Tr. 31.) In addition, her granddaughter helps her "clean inside the house." (*Id.*)

Although her mother recently passed away, Plaintiff stated that she used to care for her for days at a time. (Tr. 32.) Plaintiff's mother depended on Plaintiff for all of her needs. (*Id.*) Plaintiff is still able to drive, but rarely does so because of her "foot problems" and because she "can't sit

---

[8] "Due to the extraordinary circumstance presented by the coronavirus or COVID-19 pandemic," the hearing was conducted "over the telephone." (Tr. 25.) Plaintiff had no objection to the hearing being held telephonically. (*See* Tr. 26-27.)

[9] Ms. Kizer explained that her professional qualifications included "licensed professional counselor, certified rehabilitation counselor, and a national certified counselor." (Tr. 45.)

[10] At the hearing Plaintiff's attorney moved to amend the alleged onset date to "January 1 of 2020." (Tr. 44.)

for a long period of time." (Tr. 33.) Plaintiff can read and write, has a "GED" high school diploma, but has difficulty completing simple math. (Tr. 33-34.)

She explained that she is unable to "work[ ] a full-time job" because she is only able to sit for "up to 15 minutes," stand for "up to 25 minutes," and "walk for about five minutes" or "about 20 feet" before needing a break. (Tr. 34-35.) Due to arthritis she "can hardly close" her hands and she is "not able [ ] to carry or grab something." (Tr. 35.) Walking is difficult for Plaintiff due to the pain she experiences in her toes and ankles. (Tr. 36.) Plaintiff is prescribed medications for her "osteoporosis, pain in [her] bones, anxiety, depression, migraine headaches[ ,] high blood pressure, cholesterol, [and] gastritis." (Tr. 36-37.) Plaintiff's appetite is poor, but she eats daily. (Tr. 37.) She also stated that she sleeps "between five to six hours" nightly. (*Id.*)

Plaintiff's attorney, Mr. Hughes, questioned her next. (Tr. 37.) She stated that she experiences "chronic fatigue . . . every day," which she treats with naps. (Tr. 38.) Due to the "reactive arthritis" that has caused some "deformities in [her] hands," Plaintiff is no longer able to cook for herself. (*Id.*) She testified that her granddaughter cooks for her, as well as does her "cleaning chores around the house." (*Id.*)

Plaintiff experiences migraine headaches daily. (Tr. 39.) She used to take prescription medication to treat the migraines, but currently only takes over-the-counter medications because her doctor "forgot[ ] to prescribe [her] migraine headache medication." (*Id.*) When Plaintiff has a migraine headache, she has to "lay down and be in a dark room," and if everything is quiet the headaches will go away. (Tr. 39-40.) She also experiences anxiety daily which can cause an "all-day crying [response] for every little thing." (Tr. 40.) Plaintiff is prescribed up to two Alprazolam per day but sometimes she needs "take up to three or four." (*Id.*) To help her doctor has prescribed a "new medication" for anxiety but so far "it's not helping." (*Id.*)

15

The pain in her hands is so "severe" that it is "unbearable to carry anything" and she is unable to "lift anything [weighing] more than 10 pounds." (Tr. 41.) In addition, Plaintiff "can [only] sit for about 15 minutes, comfortably," at which point she needs to get up, go to her room, and lay down. (*Id.*) Due to her various conditions, in 2020 Plaintiff reduced the number of hours she was her mother's caretaker "because [she] wasn't able to work that routine." (Tr. 41-42.)

The vocational expert, Ms. Kizer, testified next.[11] (Tr. 46.) She testified that Plaintiff's prior work as a home health aide would be considered "semiskilled, exertion level medium," except that as "[p]erformed" it would be considered at a "very heavy" exertional level.[12] (Tr. 46.) Her prior work as a hand packager would be "unskilled, exertion level medium." (Tr. 47.) The ALJ asked the following hypothetical:

> Ms. Kizer, first hypothetical for you. Assume a person of claimant's age, educational level, past work background with the claimant's same skills. Assume further that individual is able to work at the medium exertional level, but with the following restrictions. Frequent postural, meaning balancing while standing or walking on level terrain, kneeling, stooping, crouching, crawling or climbing, all of that is frequent. Frequent handling or fingering bilaterally. Simple, routine, and repetitive tasks. Low stress work environment, with no fast-paced work or strict production quotas. . . . Could this hypothetical person perform the claimant's past work?

(Tr. 47.) Ms. Kizer responded "[n]o, Your Honor." (*Id.*) Ms. Kizer was asked "are there other job[s] in the national economy that this hypothetical person could perform"? (*Id.*) The VE identified the following three jobs:

1)      Laundry Worker: 103,000 jobs available nationally;

---

[11] Plaintiff's attorney did not have any objections to Ms. Kizer's qualifications as a vocational expert. (Tr. 46.)

[12] Ms. Kizer confirmed that she was able to "give an impartial and neutral opinion in the case" and that she was "familiar with the Dictionary of Occupational Titles, its companion publications, Selected Characteristics of Occupations, the revised DOT, and the Social Security Administrations definitions of sedentary, light, medium, heavy, and very heavy work." (Tr. 45-46 (emphasis in original).)

    2)      Day Worker:[13] 34,000 jobs available nationally; and

    3)      Counter Supply Worker: 28,000 jobs available nationally.

(Tr. 48.)

Ms. Kizer explained that "the DOT does not address types of climbing, low stress environment, or fast-paced work." (*Id.*) As to those restrictions, her testimony was based on her "education, training, and experience." (*Id.*) The ALJ also asked the VE to explain "what the employer tolerance is for off task behavior and absenteeism." (*Id.*) Again, based on her "education, training, and experience," Ms. Kizer testified that "[o]ff task generally is 10 to 15% depending on the industry" and "[a]bsenteeism generally is 2 days per month." (*Id.*)

At the hearing Plaintiff's attorney asked the VE one question, which was the following: "Are there any transferable skills from past work to sedentary work"? (Tr. 49.) Ms. Kizer responded, "[t]here is none." (*Id.*) The ALJ then confirmed that the VE's testimony was "consistent with the Dictionary of Occupational Titles and its companion publication." (*Id.*)

The ALJ asked Plaintiff if there was anything she wished to add, and she responded in the following way:

> Yes, ma'am. On my situation and my pain in which I am right now is very – my anxiety attacks are severe and prevent me to do any kind of work. It's something that I have tried to before, start something new. But here where I live at there's no kind of jobs that I can do without having to be so [ ] or cleaning up, or doing laundry, or anything where I have hold my hands which I can't. and when I have to stand a long period of time on my feet, are unbearable to sustain my weight. And it's really kind of hard even just to walk into my house, 'cause I have four steps to go into my house in a row. Which I have to take my time to get in and get out.

(Tr. 49-50.) Plaintiff's attorney then made a closing argument. (Tr. 50.) He highlighted that the medical record reflects "deformities" in Plaintiff's joints, a "limited range of motion in the hands,"

---

[13] Ms. Kizer explained that a "day worker" was a "domestic worker, a housekeeper in a home, in a private household." (Tr. 48.)

and joint pain.  (*Id.*)  Plaintiff's attorney concluded that "the specialist rheumatologist's RFC . . . would preclude work."  (*Id.*)

**D.     The ALJ's Decision**

The ALJ issued a thorough written decision, consisting of eleven pages of single-spaced type.  (Tr. 99-109.)  In making her decision, the ALJ applied the five-step method for evaluating disability claims.[14]

The ALJ first found (at Step One) that Plaintiff had not performed substantial gainful activity since the alleged onset date of disability, May 1, 2019.  (Tr. 102.)  In considering the severity of Plaintiff's impairments (Step Two), the ALJ determined that Plaintiff had the following "severe" medical impairments: "arthritis, degenerative disc disease, anxiety, depression, ADHD, and bipolar disorder (20 CFR 404.1520(c) and 416.920(c))."  (*Id.*)  In making these determinations, the ALJ summarized the medical evidence of record (which was detailed, thorough, and exhaustive).  (Tr. 102-07.)

The ALJ also found that Plaintiff's impairments were not severe enough, singly or collectively, to meet or medically equal one of the listed impairments in the regulations (Step Three).  (Tr. 102.)  In reaching this conclusion, the ALJ analyzed listings addressing Plaintiff's various physical conditions.  (*Id.*)  Specifically, the ALJ performed a detailed assessment of "Listing 1.15" regarding Plaintiff's "spinal disorder" and "Listing 1.18" regarding arthritis.  (*Id.*)

The ALJ also determined that the severity of Plaintiff's mental impairments "considered singly and in combination, do not meet or medically equal the criteria of listings 12.04, 12.06, and 12.10" (which includes the "paragraph B" and "paragraph C" criteria).  (Tr. 102-04.)  As to the

---

[14] The five-step process for determining whether a plaintiff is eligible for benefits will be explained further in the Standard of Review section of this report, *infra* Part II.A.

paragraph B criteria, the ALJ determined that Plaintiff had only "moderate limitations" in understanding, remembering, or applying information; "mild limitations" in interacting with others; and "no limitations" in concentrating, persisting, or maintaining pace or in adapting or managing oneself. (Tr. 103.) Accordingly, the ALJ did not find the "paragraph B" criteria satisfied. (*Id.*) The ALJ further determined that "the evidence fails to establish the presence of the 'paragraph C' criteria." (*Id.*)

The ALJ next assessed Plaintiff's residual functional capacity (RFC) to do physical and mental work activities. The ALJ made the following RFC finding:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except that the claimant can frequently balance while standing and walking on level terrain, kneel, stoop, crouch, crawl, or climb. The claimant can frequently handle or finger bilaterally. The claimant can perform simple, routine, and repetitive tasks. The claimant requires a low stress work environment, without fast-paced work or strict production quotas.

(Tr. 104.) In making this finding, the ALJ "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." (*Id.*)

In considering Plaintiff's symptoms, the ALJ followed the two-step process required by the regulations. First, she considered "whether there is an underlying medically determinable physical or mental impairment(s) ... that could reasonably be expected to produce the claimant's pain or other symptoms." (Tr. 104.) In addressing this inquiry, the ALJ provided a detailed summary of the medical evidence in the record.[15] (Tr. 102-07.) After assessing the evidence regarding Plaintiff's impairments, the second step of the analysis required the ALJ to "evaluate

---

[15] In addition, the ALJ summarized and considered Plaintiff's testimony at the evidentiary hearing, as well as the "Function Report submitted in conjunction with her application." (Tr. 104-05.)

the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent

to which they limit the claimant's work-related activities." (Tr. 104.)  In doing this, the ALJ also

evaluated Plaintiff's "statements concerning the intensity, persistence, and limiting effects of [her]

symptoms."  (*See* Tr. 104-07.)

Ultimately, the ALJ found that Plaintiff suffered from numerous "medically determinable

impairments . . . however, the claimant's statements concerning the intensity, persistence and

limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other

evidence in the record."  (Tr. 105.)  The ALJ explained that the medical evidence "demonstrates

consistent complaints and treatment" with a rheumatologist, primary care doctor, and a mental

health provider.  (Tr. 105.)  "However, the examinations do not provide sufficient objective

findings to support the level of severity" that Plaintiff has alleged.  (*Id.*)

The ALJ also considered the medical opinion evidence.  (Tr. 105-07.)  In fact, the ALJ

explained that she "considered the medical opinion(s) and prior administrative medical finding(s)

in accordance with the requirements of 20 CFR 404.1520c and 416.920c."  (Tr. 104.)  She began

by evaluating the opinions of Tom Dees, M.D., and George Carrion, M.D., the two state agency

medical consultants (SAMC).  (Tr. 105; *see also* Tr. 52-58, 68-80.)  She found that Drs. Dees and

Carrion's opinions that Plaintiff had "no severe impairments" was "minimally persuasive insofar

as they support less severity than [Plaintiff] alleged."  (Tr. 105.)  The ALJ continued that these

"opinions are not well supported by additional records submitted at the hearing level."  (*Id.*)

Next, the ALJ considered the opinion of Elvin R. Garcia, M.D., Plaintiff's rheumatologist.

(Tr. 106; *see also* Tr. 1114-15.)  Dr. Garcia opined that Plaintiff's RFC "was limited to a reduced

range of sedentary exertion."  (Tr. 106.)  This included that Plaintiff "could only sit or stand for

up to one hour and use her hands for 30 percent of the workday," and that she would "miss up to

four days of work per month." (*Id.*) The ALJ found "this opinion not persuasive" because it was not supported by findings from Dr. Garcia's own treatment notes of Plaintiff, and also unsupported "by the other medical records." (*Id.*)

As to the opinions of Sheri Tomak, Ph.D., and Mack Stephenson, Ph.D, the two state agency psychological/psychiatric consultants, the ALJ found their determination that Plaintiff had "no severe mental impairments" was "not fully persuasive." (Tr. 106; *see also* Tr. 52-58, 68-80.) Primarily because the opinions were inconsistent "with medical records submitted at the hearing level." (Tr. 106.)

In addition, the ALJ considered the opinion of Belen Ramos, PA-C, Plaintiff's "treating physician's assistant." (Tr. 106; *see also* Tr. 1111-13.) Ms. Ramos found that Plaintiff's mental RFC included marked limitations in numerous categories, including in her ability to manage her psychologically based symptoms and in her ability to handle conflicts. (Tr. 106.) Ms. Ramos also determined that Plaintiff had moderate limitations in her ability to follow instructions, work closely with others, and to sustain an ordinary work routine. (*Id.*) However, the ALJ found Ms. Ramos's opinions unpersuasive because they were "not supported by [Plaintiff's] mental health treatment notes." (*Id.*)

Next, the ALJ found that Plaintiff "is unable to perform any past relevant work" (Step Four). (Tr. 107.) In considering whether Plaintiff could perform any other jobs in the national economy (Step Five), the ALJ relied on the testimony of the vocational expert, Ms. Kizer. In particular, Ms. Kizer opined that given the ALJ's RFC finding, Plaintiff could perform several other jobs, including a laundry worker, day worker, and counter supply worker. (Tr. 108.) From this, the ALJ concluded that Plaintiff is not disabled.

**E.      Procedural History**

Plaintiff sought administrative review of the ALJ's decision. The Appeals Council concluded that there was no basis for challenging the decision, rendering it the Commissioner's final decision for purposes of judicial review. The instant action followed in which Plaintiff seeks review of the decision pursuant to 42 U.S.C. § 405(g). (Docket No. 1.) Pending are the parties cross-motions for summary judgment. (Docket Nos. 11, 14.) The issues have been briefed by the parties and will be analyzed in light of the applicable standard of review.

## II.  ANALYSIS

### A.    Standard of Review

To qualify for benefits under the Social Security Act (the "Act"), Plaintiff bears the burden of proving that she is disabled. 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require."); *see also Fraga v. Bowen*, 810 F.3d 1296, 1301 (5th Cir. 1987) (citing *Jones v. Heckler*, 702 F.2d 616, 620 (5th Cir. 1983)). The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 416(i)(1)(A), 423(d)(1)(A), 1382c(a)(3)(A). A "physical or mental impairment" is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* at §§ 423(d)(3), 1382c(a)(3)(D).

To determine whether a claimant is disabled within the meaning of the Act, the Commissioner applies the following five-step inquiry:

(1)    whether the claimant is currently working in substantial gainful employment;

(2)     whether the claimant suffers from a severe impairment;

(3)     whether the claimant's severe impairment is sufficient under the pertinent regulations to support a finding of disability;

(4)     whether the claimant is capable of returning to his or her past relevant work; and, if not,

(5)     whether the impairment prevents the claimant from performing certain other types of employment.

*See* 20 C.F.R. §§ 404.1520, 416.920.

A finding that a claimant is disabled or not disabled at any point in the five-step inquiry is conclusive and terminates the analysis. *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994). At Steps One through Four, the burden of proof rests upon the claimant to show that she is disabled. If the claimant satisfies this responsibility, the burden then shifts to the Commissioner at Step Five of the process to show that there is other gainful employment that the claimant is capable of performing despite her existing impairments. *Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002). Although the burden is initially on the Commissioner at Step Five, once the Commissioner makes a showing that the claimant can perform other work, the burden shifts back to the claimant to rebut the finding that there are jobs that exist in significant numbers that the claimant could perform. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005). "Throughout the process, the ultimate burden of establishing disability remains with the claimant." *Strempel v. Astrue*, 299 F. App'x 434, 437 (5th Cir. 2008) (citing *Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983)).

In this case, the ALJ found at Step Four that Plaintiff was unable to perform her past relevant work. At Step Five, the ALJ found, based on the vocational expert's testimony, that Plaintiff was not disabled because she could perform jobs existing in significant numbers in the

national economy.  In light of this evidence that Plaintiff could perform other work, the ultimate burden of proof remained with the Plaintiff.

A federal court's review of the Commissioner's final decision is limited to determining whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence in the record as a whole.  *Masterson*, 309 F.3d at 272.  Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001).  It is more than a mere scintilla, but less than a preponderance.  *Id.*  A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision.  *Id.*  Evidentiary conflicts are for the Commissioner to resolve, not the courts.  *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999).  This Court may neither reweigh the evidence in the record, nor substitute its judgment for the Commissioner's, but will carefully scrutinize the record to determine if substantial evidence is present.  *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988).  In applying this deferential standard, however, the Court is not a "rubber stamp" for the Commissioner's decision, particularly given the importance of the benefits in question.  *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985); *Alejandro v. Barnhart*, 291 F. Supp. 2d 497, 500 (S.D. Tex. 2003).

**B.**     **Issues**

In seeking review of the Commissioner's denial of benefits, Plaintiff alleges that the ALJ committed reversible error in three claims: 1) the "ALJ's [physical] RFC assessment is void of any articulated evidentiary foundation"; 2) the "ALJ failed to reconcile her [mental] RFC assessment with her psychiatric review technique findings [she made at Step 3]"; and 3) the ALJ improperly relied "on vocational expert testimony containing an unresolved conflict."  (Docket No. 11, at 1; Docket No. 12, at 8-17.)  The Commissioner argues that the ALJ did not commit reversible error

because "substantial evidence supports" both her physical and mental RFC assessments. (Docket No. 15, at 4-9.) Specifically, the ALJ found that "Plaintiff's physical examination findings did not reveal significant abnormalities" and that she has exhibited "largely normal mental status examination findings." (*Id.* at 5-6.) In addition, the Commissioner argues that "substantial evidence supports the ALJ's Step Five finding" and that "the ALJ properly relied on the VE's testimony to demonstrate the existence of jobs in significant numbers in the national economy that Plaintiff could perform." (*Id.* at 9-10.)

## C.    The ALJ's Physical RFC Determination

Plaintiff first claim is that the ALJ committed reversible error because her physical "RFC assessment is void of any articulated evidentiary foundation." (Docket No. 12, at 9.) Essentially, Plaintiff argues that because the ALJ rejected the medical opinion evidence, her physical "RFC assessment [is] unsupported by substantial evidence." (*Id.* at 9-13.) On the other hand, the Commissioner argues that the ALJ's RFC assessment is supported by substantial evidence. (Docket No. 15, at 4-9.) Here, the Commissioner is correct.

"[F]ederal regulations require ALJs to assign each medical opinion a weight and explain the reasons for that weight." *Winston v. Berryhill*, 755 F. App'x 395, 402 (5th Cir. 2018). "After [Plaintiff's] claim was filed, the Social Security Administration changed its regulations so that ALJs are no longer required to assign each medical opinion a weight: 'For claims filed on or after March 27, 2017 ... [w]e will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)....'" 20 C.F.R. § 404.1520c(a). *Winston*, 755 F. App'x at 402 n.4. One court has explained how the new regulations apply to medical opinions as follows:

> Since [Plaintiff] filed for SSI and DIB "on or after March 27, 2017," the ALJ was required to apply the new regulations. 20 C.F.R. § 404.1520c. Through

the new regulations, the Administration revised the procedures and standards for evaluating medical opinions and prior administrative medical findings, abrogating the treating physician rule. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence ("Revisions to Rules"), 82 Fed. Reg. 5844 (Jan. 18, 2017); 20 C.F.R. § 416.920c(a). As such, ALJs are "no longer required to give controlling weight" to the opinions of treating physicians. *See, e.g., Pearson v. Commissioner*, No. 20–CV–3030 (AMD), 2021 WL 3373132, at *4–*5 (E.D.N.Y. Aug. 3, 2021). Instead, the ALJ considers the persuasiveness of medical opinions from different medical sources. 20 C.F.R. § 404.1520c(b)(2). In evaluating persuasiveness, the ALJ considers five factors: (i) supportability; (ii) consistency; (iii) the source's relationship with the patient; (iv) the source's specialty; and (v) "other factors that tend to support or contradict" the opinion. 20 C.F.R. § 404.1520c(c). The most important factors in evaluating persuasiveness are supportability and consistency. 20 C.F.R. § 404.1520c(b)(2).  In considering these factors, the ALJ is required to "*explain how* [h]e considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in [Plaintiff's] determination or decision." *Id.* (emphasis added).

With respect to "supportability," "the strength of a medical opinion increases as the relevance of the objective medical evidence and explanations presented by the medical source increase." *Vellone v. Saul*, 1:20–CV–00261–RAK–HP, 2021 WL 319354, at *6 (S.D.N.Y. Jan. 29, 2021) (citing 20 C.F.R. §§ 404.1520c(c)(1)). *See also* Revision to Rules, 82 Fed. Reg. at 5853. The regulations provide that "consistency" is "an all-encompassing inquiry focused on how well a medical source is supported, or not supported, by the entire record." *Id.* (citing 20 C.F.R. §§ 404.1520c(c)(2)). *See also* Revision to Rules, 82 Fed. Reg. at 5853.

Considering the newness of the regulations, there is a dearth of caselaw concerning what constitutes a sufficient "explanation" of supportability and consistency under 20 C.F.R. § 404.1520c(b)(2). *See, e.g., Moore v. Saul*, No. 3:20–CV–48–DPJ–MTP, 2021 WL 754833, at *3 n.1 (S.D. Miss. Feb. 26, 2021). Nevertheless, the Administration's explanation of the new regulation sheds some light the issue. According to the Administration, it eschewed the treating physician rule because "the healthcare delivery system has changed in significant ways" since 1991 (when the treating physician rule was implemented) insofar as "[m]any individuals receive health care from multiple medical sources, such as from coordinated and managed care organizations, instead of from one treating [physician]." Revision to Rules, 82 Fed. Reg. at 5853. Stated differently, individuals "less frequently develop a sustained relationship with one treating physician" today. *Ibid.* As such, the Administration has found that "the two most important factors for determining the persuasiveness of medical opinions are consistency and supportability" and focusing analysis of those factors "help[s] eliminate confusion about a hierarchy of medical sources and instead focus[es] adjudication more on the persuasiveness of the content of the evidence." *Ibid.*

By contrast, under the old regulations, a treating physician's opinion was given controlling weight and could only be rejected "if the ALJ performs a *detailed analysis* of the treating physician's views under the criteria set forth in 20 C.F.R. § 404.1527(d)(2)." *Newton v. Apfel*, 209 F.3d 448, 454 (5th Cir. 2000) (emphasis added).   An ALJ's insufficient   explanation   for   departing   from that medical opinion was   grounds   for   reversal.   *Ibid.*   While the new regulations eschewed "hierarchies of medical sources" and are not meant to "make evaluating evidence more difficult," Revision to Rules, 82 Fed. Reg. at 5853, it is clear that an ALJ's sufficient explanation of the supportability and consistency of medical opinions is still a critical portion of the analysis. To be sure, the ALJ is no longer required to undertake a similarly detailed analysis in rejecting a treating physician's medical opinion as persuasive. Cf. *Newton*, 209 F.3d at 454. Therefore, adequate discussion of medical opinion persuasiveness is important.

Likewise, other courts to address the issue have come to a similar conclusion, but they have been divergent about how exactly to measure the sufficiency of an ALJ's explanation   when   there   is   at   least   some   mention of medical opinion persuasiveness. *Compare Harris v. Saul*, No. 19–CV–03715–NRN, 2021 WL 406080, at *2 (D. Colo. Feb. 5, 2021), *with Todd v. Comm'r of Soc. Sec.*, No. 3:20–CV–1374, 2021 WL 2535580, at *9 (N.D. Ohio June 3, 2021), *report and recommendation adopted*, No. 3:20–CV–1374, 2021 WL 2530846 (N.D. Ohio June 21, 2021). Most courts to address the issue appear to require the ALJ to provide a sufficient explanation of consistency and supportability to allow the court to undertake a meaningful review of whether his reasoning was supported by substantial evidence, *see, e.g., Ramirez v. Saul*, No. SA–20–CV–00457–ESC, 2021 WL 2269473, at *6 (W.D. Tex. June 3, 2021); *Todd*, 2021 WL 2535580, at *9; *Burba v. Comm'r of Soc. Sec.*, No. 1:19–CV–905, 2020 WL 5792621 (N.D. Ohio Sept. 29, 2020), and do not leave the Court to merely speculate about reasons behind the ALJ's persuasiveness finding or lack thereof, *see, e.g., Moore*, 2021 WL 754833, at *3; *Ramirez*, 2021 WL 2269473, at *6. Stated differently, there must be a discernible "logic bridge" between the evidence and the ALJ's persuasiveness finding. *Ramirez*, 2021 WL 2269473, at *6. Therefore, while the length of explanation need not be profound, *see, e.g., Vaughn v. Comm'r of Soc. Sec.*, No. 20–CV–1119–TMP, 2021 WL 3056108, at *9 (W.D. Tenn. July 20, 2021) (finding detailed three sentence explanation sufficient to be considered an explanation),[4] the ALJ must do more than pay lip service to the regulation without *substantively* engaging with the supportability and consistency of medical opinions in any detail whatsoever, *see, e.g., Howard D. v. Saul*, No. 5:19–CV–01615 (BKS), 2021 WL 1152834, at *12 (N.D.N.Y. Mar. 26, 2021). In other words, the ALJ cannot summarize the entire record and summarily conclude that, in light of that record, one medical opinion is persuasive and the other is not persuasive. *Raymond M. v. Comm'r of Soc. Sec.*, No. 5:19–CV–1313 (ATB), 2021 WL 706645, at *10 (N.D.N.Y. Feb. 22, 2021).

*Pearson v. Comm'r of Soc. Sec.*, 20-cv-166, 2021 WL 3708047, at \*4–5 (S.D. Miss. Aug. 11, 2021), *report and recommendation adopted*, 2021 WL 3663073 (S.D. Miss. Aug. 18, 2021).

To begin with, the ALJ summarized—in great detail—the relevant medical evidence in the record pertaining to Plaintiff's alleged physical (and mental, *see infra* Part II.D) impairments. (Tr. 102-07.)  The ALJ also acknowledged the relevant medical source opinions in the record. (Tr. 105-07.)  Specifically, in her opinion she addressed the medical opinions of the following; Drs. Dees and Carrion, the state agency medical consultants, and Dr. Garcia, Plaintiff's rheumatologist. (*Id.*)  In addition, the ALJ "considered the medical opinion(s) and prior administrative finding(s) in accordance with the requirements of 20 CFR 404.1520c and 416.920c," including the persuasiveness and consistency of the opinions. (Tr. 104); *see also Pearson*, 2021 WL 3708047, at \*4 (citing 20 C.F.R. § 404.1520c(b)(2)).

Here, the ALJ began by evaluating whether Plaintiff's "spinal disorder" and arthritis would—standing alone—meet or medically equal "the severity of one of the listed impairments" in the Regulations. (Tr. 102.)  Based on clinical findings in the medical treatment records, the ALJ found that neither her spinal disorder nor her arthritis satisfied those requirements. (*Id.*)

Next, the ALJ summarized Plaintiff's subjective complaints, both from her application for disability and her testimony from the evidentiary hearing. (Tr. 104-05.)  She acknowledged that Plaintiff's impairments "could reasonably be expected to cause the alleged symptoms," however, her subjective statements were "not entirely consistent with the medical evidence and the other evidence in the record." (Tr. 105.)

For example, the ALJ described Plaintiff's examinations by Dr. Garcia (her rheumatologist) and at the Elsa Medical Clinic (her primary treating clinic) as follows:

> Specifically, the claimant's rheumatology treatment records demonstrate consistent complaints of painful range of motion and pain in the claimant's lower back and

28

extremities. She has also complained of pain in her hands (Exhibit 2F, 3F, 4F, 6F, 11F). An examination performed in May 2019, revealed painful range of motion, but the claimant had normal reflexes without any sensory deficits (Exhibit 2F). Then, in October 2019, the claimant continued to exhibit normal sensation without any reflex deficits (Exhibit 3F). In a follow-up in March 2020, the claimant exhibited some tenderness in her hands and feet. However, she did not exhibit any sensory or reflex deficits (Exhibit 4F). Likewise, in August 2020, the claimant exhibited normal range of motion without any strength, sensory, or reflex deficits (Exhibit 6F). Similarly, an examination in July 2021 did not reveal significant findings (Exhibit 11F).

The claimant's primary care treatment notes are also inconsistent with the level of severity the claimant alleged. Specifically, in multiple appointments, the claimant has denied joint pain (Exhibit 7F/54, 78, 94, 118). Examination findings from her primary care doctor also do not indicate significant abnormalities (Exhibit 7F/56, 79, 96, 105, 116; 12F).

(Tr. 105.) Based on the examinations by Dr. Garcia and those at the Elsa Medical Clinic, the ALJ determined that Plaintiff "would have difficulty performing heavy exertion."[16] (Tr. 106.) The ALJ further explained that given her "history of treatment for joint and back pain," Plaintiff "requires postural limitations to avoid exacerbating her symptoms of back and joint pain." (*Id.*) These postural limitations include that Plaintiff "can frequently balance while standing and walking on level terrain, kneel, stoop, crouch, crawl, or climb."[17] (Tr. 104.) In addition, the ALJ acknowledged Plaintiff's history of "pain in her hands," as such, she determined that Plaintiff

---

[16] The ALJ did not pull this out of thin air. Rather, she made this finding because she is required to consider and evaluate whether Plaintiff could perform her past relevant work. (*See* Tr. 107.) Here, that included Plaintiff's time working as a home health aide, which as she "actually performed" it was at a "very heavy" exertional level. (*See* Tr. 46.)

[17] The "postural limitations" that the ALJ assessed specifically address and accommodate Plaintiff's arthritis and joint issues. (Tr. 106; *see also* Docket No. 12, at 11.)

could only "frequently handle and finger" objects.[18]  (Tr. 106.)  Based on these records, the ALJ

determined that Plaintiff's physical RFC "is limited to medium exertion."[19]  (*Id.*)

Plaintiff argues that in determining her physical RFC, the "ALJ found each [medical

opinion in the record] to be unsupported and/or inconsistent with the record." (Docket No. 12, at

9.)  In essence, Plaintiff argues that by "express[ing] disagreement with all of them," the ALJ

actually "rejected every medical opinion." (*Id.*)  In addition, Plaintiff argues that "the reasoning

behind the ALJ's [RFC] finding is not apparent from her decision." (*Id.* at 12.)  Both of Plaintiff's

---

[18] This portion of the ALJ's RFC finding specifically addresses, and more importantly, accommodates, the pain/joint/swelling issues that Plaintiff was experiencing in her hands.  (Tr. 106; *see also* Docket No. 12, at 12.)

[19] Under the regulations "medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. §§ 404.1567(c) and 416.967(c).  The term "medium work is further defined as follows:

> The regulations define medium work as lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. A full range of medium work requires standing or walking, off and on, for a total of approximately 6 hours in an 8-hour workday in order to meet the requirements of frequent lifting or carrying objects weighing up to 25 pounds. As in light work, sitting may occur intermittently during the remaining time. Use of the arms and hands is necessary to grasp, hold, and turn objects, as opposed to the finer activities in much sedentary work, which require precision use of the fingers as well as use of the hands and arms.

> The considerable lifting required for the full range of medium work usually requires frequent bending-stooping (Stooping is a type of bending in which a person bends his or her body downward and forward by bending the spine at the waist.) Flexibility of the knees as well as the torso is important for this activity. (Crouching is bending both the legs and spine in order to bend the body downward and forward.) However, there are a relatively few occupations in the national economy which require exertion in terms of weights that must be lifted at times (or involve equivalent exertion in pushing or pulling), but are performed primarily in a sitting position, e.g., taxi driver, bus driver, and tank-truck driver (semiskilled jobs). In most medium jobs, being on one's feet for most of the workday is critical. Being able to do frequent lifting or carrying of objects weighing up to 25 pounds is often more critical than being able to lift up to 50 pounds at a time.

SSR 83-10, 1983 WL 31251, at *6.

assertions are incorrect. Although Plaintiff takes issue with the ALJ's ultimate conclusion that despite her impairments, she can still perform work at the medium exertional level, a review of the record shows that the ALJ accurately stated the medical findings that she relied upon in reaching her decision. Those medical records provide substantial evidence to support the ALJ's finding that Plaintiff retains the capacity to perform a restricted range of medium exertional work.

To begin with, the ALJ "considered the opinions of the State agency medical consultants," Drs. Dees and Carrion, who "found no severe impairments." (Tr. 105.) The ALJ determined that their opinions were only "*minimally persuasive* insofar as they support less severity than the claimant alleged." (*Id.* (emphasis added).) The ALJ noted that "the record supports finding severe physical impairments with corresponding functional limitations," based in part on "*additional records [that were] submitted at the hearing level*." (*Id.* (emphasis added).)

The ALJ "also considered a statement submitted by [Dr. Garcia] indicating that [Plaintiff] was limited to a reduced range of sedentary exertion." (Tr. 106.) In finding Dr. Garcia's "opinion not persuasive," she began by noting that the opinion was "not supported by findings in [Dr. Garcia's own] treatment notes." (*Id.*) In addition, she determined that the opinion was "also not supported by the other medical records," including those from Plaintiff's numerous visits to the Elsa Medical Clinic. (*Id.*) Plaintiff's suggestion that this is reversible error and that the ALJ's RFC is not supported by substantial evidence is incorrect. *See Webster v. Kijakazi*, 19 F.4th 715, 719 (5th Cir. 2021) ("Though the ALJ neither adopted the state agency report verbatim nor accepted the testimony of Dr. Small, it cannot be said that his decision was not based on substantial evidence or that he improperly applied the relevant legal standards.").

To be sure, Dr. Garcia made numerous medical findings related to Plaintiff's physical limitations, as relevant to her RFC, which include the following:

- Hand, knee, and toe pains of "*moderate*" intensity (Tr. 434, 442, 447);

- Joint stiffness, arthralgias, and myalgias (Tr. 434, 438, 442, 447, 715, 1119);

- Back pain (Tr. 442, 447);

- Osteoarthritis (Tr. 438, 442), polyarthritis (Tr. 447), or reactive arthritis (Tr. 715, 1117); and

- Pain with range of motion in neck and/or back (Tr. 440).[20]

However, the ALJ highlighted that Dr. Garcia's examinations of Plaintiff repeatedly showed "normal reflexes" and no "sensory deficits." (Tr. 105-06.) Because of this, the ALJ found the "restrictive limitations" in Dr. Garcia's RFC evaluation of Plaintiff "not persuasive." (Tr. 106.) Specifically, she determined that Dr. Garcia's "own treatment notes," as well as Plaintiff's "other medical records"[21] do not support Dr. Garcia's RFC. (*Id.*)

For example, as the ALJ pointed out, Plaintiff's "examinations have consistently revealed normal sensation without reflex or strength deficits." (*Id.*; *see also* Tr. 436, 440, 444, 449, 717.) Specifically, Plaintiff's visits with Dr. Garcia have also revealed the following benign findings:

- Pain and/or symptoms of "*mild*" intensity (Tr. 438, 715, 1117);

- Symptoms that are relieved with NSAIDs (Tr. 715, 1117);

- Plaintiff experiencing "no apparent distress" (Tr. 436, 440, 444, 449, 717, 1119); and

- "[N]o limb or joint pain with range of motion" (Tr. 717).

---

[20] Some of these findings were also noted in Plaintiff's treatment records from the Elsa Medical Clinic. For example, Plaintiff has complained of joint pain, (Tr. 510, 554, 594), back pain (Tr. 569, 580, 801, 908), and finger/toe pain (Tr. 506, 554, 595). In 2018, Plaintiff was also diagnosed with osteoporosis of her lumbar spine. (Tr. 704.)

[21] The ALJ is referring to Plaintiff's medical records from the Elsa Medical Clinic.

The ALJ continued noting that Plaintiff's visits to the Elsa Medical Clinic "demonstrate routine care" and "have also not revealed significant objective findings." (Tr. 106.)  For example, physical examinations at the Elsa Medical Clinic repeatedly revealed normal range of motion (Tr. 479, 598, 593, 590, 587, 584, 484, 581, 578, 573, 564, 564, 561, 559, 552, 512, 549, 542, 538, 504, 521, 518, 535, 532, 823, 818, 814, 809, 797, 1134, 1130, 1124), normal strength (Tr. 479, 598, 593, 590, 587, 584, 484, 581, 578, 573, 549), and normal gait (Tr. 788).  *See Britton v. Saul*, 827 F. App'x 426, 429-30 (5th Cir. 2020) (physical examination findings are relevant and substantial evidence supporting an RFC assessment).  In addition, Plaintiff's subjective statements included the following:

- No (or mild) back pain (Tr. 478, 597, 592, 569, 563, 558, 551, 511, 528, 523, 821, 817, 812, 787, 808, 805, 799, 796, 1132, 1122); and

- No/mild/improving joint pain (Tr. 510, 537, 502, 520, 517, 534, 531, 554, 1126).

Contrary to Plaintiff's assertion that the reasoning behind the ALJ's decision is not apparent; here, the ALJ provided "a sufficient explanation of consistency and supportability to allow the court to undertake a meaningful review of whether his reasoning was supported by substantial evidence."  *See Pearson*, 2021 WL 3708047, at *5.  "Stated differently, there [is] a discernible 'logic bridge' between the evidence and the ALJ's persuasiveness finding."  *See Pearson*, 2021 WL 3708047, at *5.  Although Plaintiff disagrees with the ALJ's RFC determination as it relates to her alleged physical impairments, the evidence of record shows that the RFC is supported by substantial evidence.

Finally, after considering Plaintiff's various subjective complaints in light of the medical evidence, the ALJ determined that Plaintiff's "symptoms are not entirely consistent with the medical evidence and other evidence in the record." (Tr. 105.)  Stated another way, the ALJ found

that Plaintiff's subjective complaints—as much as they relate to her ability to perform a restricted range of medium work—were not fully credible.[22]  This credibility finding is entitled to "considerable deference," particularly since the ALJ had the opportunity to observe Plaintiff's testimony at the hearing.  *Falco v. Shalala*, 27 F.3d 160, 164 & n.18 (5th Cir. 1994) (noting that an ALJ's findings regarding a claimant's subjective complaints of pain "are precisely the kinds of determinations that the ALJ is best positioned to make," particularly since the ALJ "enjoys the benefit of perceiving firsthand the claimant at the hearing").

Contrary to Plaintiff's argument that the ALJ's RFC is legally insufficient, there is clearly substantial evidence in the record to support the ALJ's findings regarding Plaintiff's alleged physical limitations.  While there is evidence suggesting that Plaintiff's severe impairments restrict her significantly (as the ALJ acknowledged in her opinion), it is the ALJ's task to determine—based on all the evidence of record—the seriousness of those impairments and their effect on Plaintiff's ability to perform work-related activities.  *See Newton*, 209 F.3d at 455 ("[T]he ALJ has sole responsibility for determining a claimant's disability status.").  Because the ALJ's RFC finding is supported by substantial evidence in the record, Plaintiff's challenge to that finding lacks merit.

**D.      The ALJ's Mental RFC Determination**

Next, Plaintiff claims that the ALJ's mental RFC determination is not supported by substantial evidence because she "failed to reconcile her [mental] RFC assessment with her psychiatric review technique findings [she] made at Step 3." (Docket No. 12, at 13-15.)  To the contrary, the Commissioner argues that the "ALJ properly considered the medical evidence when

---

[22] An ALJ may consider a claimant's positive response to treatment and improving symptoms when evaluating her subjective complaints of the disabling nature of her conditions.  *See Anderson v. Berryhill*, No. H-15-CV-2444, 2017 WL 657528, at *9-10 (S.D. Tex. Feb. 15, 2017).

assessing Plaintiff's mental RFC and accommodated her mental impairments by including [ ] mental limitations in the RFC finding." (Docket No. 15, at 8.) Perhaps more importantly, the Commissioner argues that, ultimately, the ALJ's mental RFC determination is properly supported by substantial evidence. (*Id.*)

As noted, the ALJ summarized the relevant medical evidence in the record pertaining to Plaintiff's alleged mental impairments. (Tr. 102-07.) In addition, the ALJ also acknowledged the relevant medical source opinions in the record; including those of Drs. Tomak and Stephenson (the state agency psychological consultants) and Ms. Ramos, PA-C (Plaintiff's treating physician's assistant). (Tr. 106-07.) She also "considered the medical opinion(s) and prior administrative finding(s) in accordance with the requirements of 20 CFR 404.1520c and 416.920c," including the persuasiveness and consistency of the opinions. (Tr. 104); *see also Pearson*, 2021 WL 3708047, at *4 (citing 20 C.F.R. § 404.1520c(b)(2)).

In fact, as to the medical opinions of Drs. Tomak and Stephenson, the state agency psychological consultants, the ALJ did not fully reject them as Plaintiff argues. (*See* Docket No. 12, at 13.) Rather, the ALJ determined that their opinions were not "*fully persuasive*." (Tr. 106 (emphasis added).) The ALJ explained that their opinions were "not consistent with medical records *submitted at the hearing level*." (*Id.* (emphasis added).) Tr. 106.) Drs. Tomak and Stephenson disagreed on the severity of Plaintiff's mental impairments. (*See* Tr. 55-56, 76.) In addition, Dr. Tomak found "insufficient evidence" to evaluate Plaintiff's ability to understand information, interact with others, concentrate, and manage oneself. (Tr. 55-56.) In contrast, Dr. Stephenson found that Plaintiff had the following: 1) no deficits in her ability to understand information or manage oneself; and 2) mild deficits in her ability to interact with others and to concentrate. (Tr. 76.) However, both Drs. Tomak and Stephenson found that Plaintiff was "not

disabled" and they determined that a mental RFC assessment of Plaintiff was unnecessary. (Tr. 57, 79.) In finding these opinions not fully persuasive, the ALJ noted Plaintiff's "consistent treatment for a mental health impairment." (Tr. 106.)

> As to Ms. Ramos's medical opinion, the ALJ summarized it as follows:

> This clinician found that the claimant had *marked limitations* in the following specific areas of functioning: using the reasoning and judgment to make work-related decisions, completing a normal workday without significant breaks, managing psychologically based symptoms, making independent plans, handling conflict, and maintaining social interactions. Otherwise, she found only *moderate limitations* in the claimant's mental functioning (Exhibit 9F).

(Tr. 106 (emphasis added).) The ALJ found that "[t]his opinion is not persuasive because it is not supported by [Plaintiff's] mental health treatment notes." (*Id.*) The ALJ highlighted that Plaintiff's mental health clinical visits "have generally revealed normal mental status without significant objective findings" and that she "has only presented for routine medication management." (Tr. 106-07.) The ALJ concluded that "[o]verall, these records do not provide sufficient objective findings to support [Ms. Ramos's] extreme limitations." (Tr. 107.)

   However, the ALJ concluded that "given [Plaintiff's] history of mental health treatment and difficulty dealing with stress and complex tasks," she is "limited to simple, routine, and repetitive tasks [and] also requires a low stress work environment without fast-paced work or strict production quotas." (Tr. 107.) Here again, the ALJ provided "a sufficient explanation of consistency and supportability to allow the court to undertake a meaningful review of whether his reasoning was supported by substantial evidence." *See Pearson*, 2021 WL 3708047, at *5. "Stated differently, there [is] a discernible 'logic bridge' between the evidence and the ALJ's persuasiveness finding." *See Pearson*, 2021 WL 3708047, at *5.

   Although Plaintiff disagrees with the ALJ's RFC determination as it relates to her alleged mental impairments, the evidence of record shows that the RFC is supported by substantial

evidence. For each of the medical opinions, the ALJ explained how and/or why they were supported and consistent with the record, or how and/or why they were not.[23] (Tr. 105-07.) "To be sure, the ALJ is no longer required to undertake a [ ] detailed analysis in rejecting a treating physician's medical opinion as persuasive." *Pearson*, 2021 WL 3708047, at *5. Furthermore, "the length of explanation need not be profound." *Id.* In any event, the ALJ's summary of the relevant medical evince and her explanation of her treatment of the medical source opinions was not cursory, in fact, far from it. Stated another way, the ALJ's treatment of the persuasiveness—or lack thereof—of the medical opinions is supported by substantial evidence.[24]

To be sure, Plaintiff has been complaining of experiencing depression and/or anxiety for much of her life. (*See* Tr. 597 (In 2017, Plaintiff stated that she has experienced "longstanding" and "recurrent anxiety."), 1047 (In 2019, Plaintiff stated that "she ha[s] been depressed since she was 20" years old.).) However, the medical records do not reflect Plaintiff complaining of mental health symptoms until June 27, 2018. (Tr. 562). At that time she described her anxiety as "difficulty concentrating, feeling of fear, nervousness and restlessness." (*Id.*) "The severity of the anxiety is moderate," "episodic," and "has lasted for 3 months." (*Id.*) It was also noted that her anxiety was exacerbated by "missed medication." (*Id.*) In October 2019, the severity of her anxiety was also assessed to be "moderate" in severity, due to "emotional stress." (Tr. 517.)

The majority of Plaintiff's mental health treatment has been with Ms. Ramos, PA-C. Plaintiff presented for treatment to Ms. Ramos beginning in 2019 (five visits), and continuing in

---

[23] Furthermore, the ALJ is required to discuss the evidence but "is not always required to do an exhaustive point-by-point discussion." *Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007) (citing *Cook v. Heckler*, 783 F.2d 1168, 1172 (4th Cir. 1986)).

[24] However, it bears repeating that the issue is not whether the Court would reach the same conclusion as did the ALJ. *Johnson*, 864 F.2d at 343 ("we may not reweigh the evidence in the record, nor try the issues *de novo*, nor substitute our judgment for that of the Secretary, even if the evidence preponderates against the Secretary's decision").

2020 (eight visits), and 2021 (four visits).  At her initial visit, Ms. Ramos assessed the severity of Plaintiff's depression and anxiety as "moderate."  (Tr. 1048-49.)  Plaintiff repeatedly complained of experiencing depression and/or anxiety in 2019 (Tr. 1056, 1061, 1065, 1069), 2020 (Tr. 1073, 1077, 1083, 1089, 1095, 1099, 1104, 1108), and 2021 (Tr. 1160, 1165, 1206).

However, during visits with Ms. Ramos Plaintiff has continually denied experiencing depression or anxiety, stated that her symptoms were improving, and/or that her medications were helping to alleviate her symptoms.  (Tr. 1073, 1083, 1095, 1104, 1108, 1154.)  Consistent with this, upon examination Ms. Ramos has regularly found no signs of depression (Tr. 1075, 1085, 1091, 1095, 1105, 1108) or anxiety (Tr. 1052, 1058, 1063, 1067, 1075, 1085, 1091, 1095, 1105, 1108).  Regardless of her subjective statements, Ms. Ramos continued to assess numerous appropriate and intact mental status findings during her examinations.  These findings included normal speech, intact language skills, appropriate affect, intact associations, intact cognitive functioning, and fully oriented.  (Tr. 1052, 1058, 1063, 1067, 1070, 1075, 1085, 1091, 1095, 1101, 1105, 1108, 1154, 1160, 1165, 1206.)  Plaintiff also repeatedly displayed a "mental status [with] no gross abnormalities."  (Tr. 1058, 1067, 1075, 1085, 1091, 1095, 1105, 1108, 1206.)

In addition, Plaintiff's other medical records also reflect improving mental health symptoms or lack of mental health symptoms altogether.  For example, for the years 2017-2021 (five years) Plaintiff visited the Elsa Medical Clinic approximately 47 times.  During those visits, she only complained of experiencing depression and/or anxiety symptoms seven times.  Four of those occasions were in 2018 (Tr. 562, 560, 557, 510) and three were in 2019 (Tr. 537, 502, 517).  Specifically, those visits showed the following benign findings:

- Mild symptoms (Tr. 560, 510, 537);

- Improving symptoms (Tr. 557, 510); and

- Medication helping (Tr. 557, 510, 537).

During the visits her examinations also showed that she was alert, oriented, and with appropriate

mood and affect.  (Tr. 564, 561, 559, 512, 538, 504, 518.)  Similarly, between 2019-2021 (three

years) Plaintiff visited Dr. Garcia six times.  During all of these visits she denied experiencing any

symptoms of depression and/or anxiety.  (Tr. 434, 438, 442, 447, 715, 1118, 1119.)  In addition,

her examinations showed that she was alert and oriented, had appropriate affect, good insight, and

good judgment.  (Tr. 436, 440, 444, 449, 717, 1119.)

In taking issue with the ALJ's ultimate mental RFC findings, Plaintiff asserts that the ALJ

failed to articulate why her RFC did not include any "limitations relative to social interaction,"

after she found that Plaintiff was "mildly" limited in her ability to interact with others.  (Docket

No. 12, at 13.)  Specifically, in assessing the severity of Plaintiff's mental impairments, the ALJ

analyzed the "paragraph B" criteria against the backdrop of the medical evidence of record.  (Tr.

103.)  She explained the framework for her analysis in the following way:

> The limitations identified in the "paragraph B" criteria are not a residual functional
> capacity assessment but are used to rate the severity of mental impairments at steps
> 2 and 3 of the sequential evaluation process. The mental residual functional
> capacity assessment used at steps 4 and 5 of the sequential evaluation process
> requires a more detailed assessment of the areas of mental functioning. The
> following residual functional capacity assessment reflects the degree of limitation
> the undersigned has found in the "paragraph B" mental function analysis.

(Tr. 103-04.)  As relevant here, the ALJ found that "[i]n interacting with others, [Plaintiff] has

mild limitations."  (*Id.*)  She explained:

> In interacting with others, the claimant has mild limitations. The claimant did not
> allege any problems related to this domain. However, according to her statements,
> the claimant is also able to get along with others, spend time with friends and
> family, and go shopping in stores (Exhibit 11E). Finally, the medical evidence
> shows that the claimant had a good rapport with providers and was described as
> pleasant and cooperative (Exhibit 8F/9, 15, 20, 24, 27, 32, 34, 42, 48, 52, 58; 14F/2,
> 8, 13; 17F).

(Tr. 103.)  Notably, the ALJ found—in addition to other mental health limitations—that Plaintiff was limited to a "low stress work environment." (Tr. 107.)

This is not the case where the ALJ failed to find that Plaintiff had severe mental impairments; to the contrary, the ALJ determined that her "anxiety, depression, ADHD, and bipolar disorder" were "severe impairments." (Tr. 102.)  This is also not the case where the ALJ failed to include mental health limitations in Plaintiff's RFC determination.  Again, the ALJ found that "given [Plaintiff's] history of mental health treatment and difficulty dealing with stress and complex tasks," she was reasonably "limited to simple, routine, and repetitive tasks[,]" and that she "requires a low stress work environment without fast-paced work or strict production quotas." (Tr. 107.)  Contrary to Plaintiff's assertion that the ALJ did not adequately explain her RFC limitations, she made clear that her "residual functional capacity assessment *reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis*." (Tr. 104 (emphasis added).)  Those "paragraph B" findings included Plaintiff's mild restriction in "interacting with others."

In support of her claim, Plaintiff cites *Castillo v. Kijakazi*, 599 F. Supp. 3d 483 (W.D. Tex. 2022). (Docket No. 12, at 14.)  However, her reliance on *Castillo* is misplaced for several reasons. First, in *Castillo* the ALJ "declined to include any mental functional limitations in his [RFC] analysis largely, because in his opinion, [the claimant's] depressive disorder was [not] severe." 599 F. Supp. 3d at 489.  Here, the ALJ found both that Plaintiff has several "severe" mental health conditions (anxiety, depression, ADHD, and bipolar disorder), and she in fact included mental functional limitations in her RFC analysis. (Tr. 106-07.)  In addition, in *Castillo*, the ALJ's "error [was in his] failure to *consider* whether mental functional limitations were warranted." *Castillo*, 599 F. Supp. 3d at 489 (emphasis in original).  That did not happen here, in fact, quite the opposite.

Plaintiff's claim—in essence—is a disagreement with the ALJ's ultimate mental health RFC because she prefers Ms. Ramos's, which is more restrictive. However, "[t]he Commissioner, rather than the courts, must resolve conflicts in the evidence."[25] *Martinez v. Chater*, 64 F.3d 172, 174 (5th Cir. 1995). In resolving the conflicts in the medical evidence of record, the ALJ did "not leave the Court to merely speculate about reasons behind her persuasiveness finding or lack thereof." *Pearson*, 2021 WL 3708047, at *5. Rather, her reasoning provided a "'logic bridge' between the evidence and her persuasiveness finding" as to the medical opinions in the record. *Id.* More importantly, the ALJ's persuasiveness findings are supported by substantial evidence in the record, and Plaintiff's claim attacking the ALJ's RFC determination should be rejected.

**E.    Error Regarding the VE's Testimony**

Plaintiff's final claim is that the ALJ committed reversible error by relying "on vocational expert testimony containing an unresolved conflict." (Docket No. 12, at 15.) Specifically, Plaintiff argues "only one of the occupations the vocational expert provided [actually] falls within the RFC assessed by the ALJ." (*Id.* at 16.) Plaintiff also argues that the occupation of "counter supply worker" is not "viable" because it amounts to "just 28,000 jobs in the entire country." (*Id.*) The Commissioner argues that Plaintiff final claim should be rejected because she has presented "no apparent conflict . . . between the VE's testimony" and the DOT. (Docket No. 15, at 10.)

In order for the ALJ to rule on Plaintiff's application for disability benefits at Step Five, she had to determine two issues. First, "[t]he ALJ needed to identify the types of jobs [Plaintiff]

---

[25] Furthermore, "the ALJ has sole responsibility for determining a claimant's disability status," and "the ALJ is free to reject the opinion of *any* physician when the evidence supports a contrary conclusion." *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000) (quoting *Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir. 1994)) (emphasis added). "[T]he ALJ 'is entitled to determine the credibility of *medical experts* as well as lay witnesses and weigh their opinions accordingly.'" *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994) (quoting *Scott v. Heckler*, 770 F.2d 482, 485) (5th Cir. 1994) (emphasis added)).

could perform notwithstanding his disabilities." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1152–53

(2019) (citing 20 CFR §§ 404.1560(c)(1), 416.960(c)(1)).  Second, "the ALJ needed to ascertain

whether those kinds of jobs 'exist[ed] in significant numbers in the national economy.'" *Biestek*,

139 S. Ct. at 1152 (citing §§ 404.1560(c)(1), 416.960(c)(1); *see* §§ 404.1566, 416.966).  "For

guidance on such questions, ALJs often seek the views of 'vocational experts.'"[26] *Biestek*, 139 S.

Ct. at 1152 (citing §§ 404.1566(e), 416.966(e); SSA, Hearings, Appeals, and Litigation Law

Manual I–2–5–50 (Aug. 29, 2014)).

The Supreme Court has recently described the role of the vocational expert as follows:

> Those experts are professionals under contract with SSA to provide impartial
> testimony in agency proceedings. *See id.*, at I–2–1–31.B.1 (June 16, 2016); *id.*, at
> I–2–5–48.  They must have "expertise" and "current knowledge" of "[w]orking
> conditions and physical demands of various" jobs; "[k]nowledge of the existence
> and numbers of [those jobs] in the national economy"; and "[i]nvolvement in or
> knowledge of placing adult workers[ ] with disabilities[ ] into jobs." *Id.*, at I–2–1–
> 31.B.1.  Many vocational experts simultaneously work in the private sector locating
> employment for persons with disabilities. *See* C. Kubitschek & J. Dubin, Social
> Security Disability Law & Procedure in Federal Court § 3:89 (2019).  When
> offering testimony, the experts may invoke not only publicly available sources but
> also "information obtained directly from employers" and data otherwise developed
> from their own "experience in job placement or career counseling." Social Security
> Ruling, SSR 00–4p, 65 Fed. Reg. 75760 (2000).

---

[26] "Among the sources of evidence that the Commissioner consults to determine when
claimants can perform alternative, available work are vocational experts and a United States
Department of Labor publication title the Dictionary of Occupational Titles (DOT)." *Gaspard v.
Soc. Sec. Admin. Comm'r*, 609 F. Supp. 2d 607, 612 (E.D. Tex. 2009).  The Court in *Gaspard* went
on to explain:

> The *DOT* and its supplement, *Selected Characteristics of Occupations
> Defined in the Revised Dictionary of Occupational Titles (SCO),* comprise a
> comprehensive listing of job titles in the United States, along with detailed
> descriptions of requirements for each job, including assessments of exertional
> levels and reasoning abilities necessary for satisfactory performance of those jobs.
> The Commissioner recognizes the *DOT/SCO* publications as authoritative, and
> routinely relies on them "for information about the requirements of work in the
> national economy." Soc. Sec. R. 00–4p, 2000 WL 1898704, at *2.

*Id.* at 612-13.

*Biestek*, 139 S. Ct. at 1152–53.  Stated another way, "[t]he value of a vocational expert is that he [or she] is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed." *Carey v. Apfel*, 230 F.3d 131, 145 (5th Cir. 2000).

The testimony of the vocational expert "would be the kind of evidence—far 'more than a mere scintilla'—that 'a reasonable mind might accept as adequate to support' a finding about job availability." *Biestek*, 139 S. Ct. at 1155 (quoting *Consolidated Edison* v. N.L.R.B., 305 U.S. 197, 229 (1938)).  "The inquiry, as is usually true in determining the substantiality of evidence, is case-by-case." *Biestek*, 139 S. Ct. at 1157 (citing *Richardson v. Perales*, 402 U.S. 389, 399 (1971) (rejecting a categorical rule pertaining to the substantiality of medical reports in a disability hearing)).  "It takes into account all features of the vocational expert's testimony, as well as the rest of the administrative record." *Biestek*, 139 S. Ct. at 1157.  "And in so doing, it defers to the presiding ALJ, who has seen the hearing up close." *Biestek*, 139 S. Ct. at 1157.

At the evidentiary hearing,[27] the vocational expert, Diana Kizer, explained her expertise.[28] (Tr. 45-46.)  Plaintiff did not challenge or object to Mr. Kizer's qualifications.  (Tr. 46.)  As noted, at the hearing the ALJ asked the following hypothetical:

> Ms. Kizer, first hypothetical for you.  Assume a person of claimant's age, educational level, past work background with the claimant's same skills.  Assume further that individual is able to work at the medium exertional level, but with the following restrictions.  Frequent postural, meaning balancing while standing or

---

[27] Significantly, the ALJ complied with the suggestion in SSR 82-61 that "it may be necessary to utilize the services of a vocational specialist or vocational expert." 1982 WL 31387 (1982).  The ALJ heard testimony from a vocational expert at the hearing. *See Adams v. Astrue*, No. 08-135, 2009 WL 774845, at *8 (W.D. La. Mar. 24, 2009) (ALJ fully complied with SSR 82-61 when he employed the use of a VE at the evidentiary hearing).

[28] Ms. Kizer explained that she was "a licensed professional counselor, certified rehabilitation counselor, and a national certified counselor." (Tr. 45.)  She also confirmed that she was able to "give an impartial and neutral opinion in the case" and that she was "familiar with the <u>Dictionary of Occupational Titles</u>, its companion publications, <u>Selected Characteristics of Occupations</u>, the revised <u>DOT</u>, and the Social Security Administrations definitions of sedentary, light, medium, heavy, and very heavy work." (Tr. 45-46 (emphasis in original).)

walking on level terrain, kneeling, stooping, crouching, crawling or climbing, all of that is frequent.  Frequent handling or fingering bilaterally.  Simple, routine, and repetitive tasks.  Low stress work environment, with no fast-paced work or strict production quotas. . . . Could this hypothetical person perform the claimant's past work?

(Tr. 47.)  Ms. Kizer responded "[n]o, Your Honor."  (*Id.*)  Ms. Kizer was asked "are there other job[s] in the national economy that this hypothetical person could perform"?  (*Id.*)  The VE identified the following three jobs: 1) Laundry Worker: 103,000 jobs available nationally; 2) Day Worker:[29] 34,000 jobs available nationally; and 3) Counter Supply Worker: 28,000 jobs available nationally.  (Tr. 48.)

The Social Security Administration requires that before an ALJ may rely on the testimony of a vocational expert, he must "[i]dentify and obtain a reasonable explanation for any conflicts between occupational evidence provided by [the] VE [ ] and information in the Dictionary of Occupational Titles (DOT), . . . , and Explain in the determination or decision how any conflict that has been identified was resolved."  SSR 00-4P, 2000 WL 1898704, at *1 (2000).  In response to the ALJ, Ms. Kizer confirmed that her testimony was "consistent with the [DOT] and its companion publication," and that her opinion was otherwise based on her "education, training, and experience."  (Tr. 48-49.)  Here again, Plaintiff did not challenge or object to the underlying basis for the VE's testimony at the hearing.

In her decision finding that Plaintiff failed to meet her burden to show that she is disabled, the ALJ stated the following: "Pursuant to SSR 00-4p, the undersigned has determined that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles."  (Tr. 108.)  As the Fifth Circuit has recognized, "the ALJ may rely upon the

---

[29] Ms. Kizer explained that a "day worker" was a "domestic worker, a housekeeper in a home, in a private household."  (Tr. 48.)

vocational expert's testimony provided that the record reflects an adequate basis for doing so." *Carey*, 230 F.3d at 146.  "Moreover, claimants should not be permitted to scan the record for implied or unexplained conflicts between the specific testimony of an expert witness and the voluminous provisions of the DOT, and then present that conflict as reversible error, when the conflict was not deemed sufficient to merit adversarial development in the administrative hearing." *Carey*, 230 F.3d at 146-47; *see also Pineda v. Astrue*, 289 F. App'x 710, 714 (5th Cir. 2008) (same).

Here, Plaintiff argues that the ALJ committed reversible error because the occupations that the VE opined that she could perform are precluded by the RFC determination.  (Docket No. 12, at 16.)  Specifically, one of the occupations that the VE identified was that of a "laundry worker." (Tr. 48, 108.)  However, Plaintiff contends that the occupation of "laundry worker" requires an employee to "perform[ ] a variety of duties," which is inconsistent with "repetitive" work.  (Docket No. 12, at 16.)  The Commissioner argues that Plaintiff final claim should be rejected because she has presented "no apparent conflict . . . between the VE's testimony" and the DOT.  (Docket No. 15, at 10.)  Further, the Commissioner explains that the occupation of "laundry worker" is unskilled, the least complex kind of work, and consistent with the RFC determination provided by the ALJ.  (*Id.*)

> As relevant here, "laundry worker" is defined in the following way:
>
> Washes and irons wearing apparel, sheets, blankets, and other linens and clothes used by employees of logging, construction, mining, or other camp, or washes uniforms, aprons, and towels in establishments supplying employees with these linens. Uses equipment usually found in household or in small laundry.

DICOT 361.684-014, 1991 WL 672983.  Furthermore, "laundry worker" is an SVP (specific vocational preparation) Level-2, which is considered "unskilled." *Id.*; (Tr. 48, 108.)  "An unskilled job is 'work which needs little or no judgment to do simple duties.'" *Lawrence T. v. Kijakazi*, No.

4:22-CV-903, 2023 WL 5808374, at *5 (S.D. Tex. Sept. 7, 2023) (quoting *Frazier v. Colvin*, No. A-11-CA-901-SS, 2013 WL 12393909, at *4 (W.D. Tex. Aug. 30, 2013)).  Unskilled work also equates to "simple, repetitive tasks."  *Lawrence T.*, 2023 WL 5808374, at *5 (quoting *Frazier*, 2013 WL 12393909, at *4).  Finally, "courts have repeatedly found that jobs with a GED reasoning development level 2 are consistent with limitations to simple instructions and routine tasks." *Lawrence T.*, 2023 WL 5808374, at *5 (quoting *Solis v. Colvin*, No. H-12-CV-1848, 2013 WL 12106139, at *3 (S.D. Tex. May 22, 2013)).

As noted, in testifying that Plaintiff could perform the occupation of "laundry worker," the ALJ provided a hypothetical individual for the VE to consider.  (Tr. 47.)  The hypothetical specifically included that the person was restricted to "[s]imple, routine, and repetitive tasks."  (*Id.*) After considering this, VE testified that the job of "laundry worker" would be available to such an individual.  (Tr. 47-48.)  The VE, Ms. Kizer, confirmed that her testimony was "consistent with the [DOT] and its companion publication," *otherwise*, she based her opinion on her "education, training, and experience."  (Tr. 48-49 (emphasis added).)  Here, it was not reversible error for the ALJ to rely on this testimony.  *Biestek*, 139 S. Ct. at 1155 (The testimony of the vocational expert "would be the kind of evidence—far 'more than a mere scintilla'—that 'a reasonable mind might accept as adequate to support' a finding about job availability.").

Finally, merely because the DOT describes the "laundry worker" position as "perform[s] a variety of duties" does not mean that those "duties" could not be "repetitive" in nature.  In any event, being able to "perform[ ] a variety of duties" would not necessarily mean that that would be required for all such "laundry worker" positions.  *See Lawrence T.*, 2023 WL 5808374, at *6 ("Moreover, merely because the DOT describes the hand laundry worker position as a reasoning

46

level 2 position does not mean that reasoning level 2 is required for all such positions.") citing *Frazier*, 2013 WL 12393909, at *4)).

Finally, in relying on the VE's testimony, the ALJ implicitly found that her testimony was both credible and persuasive. (*See* Tr. 108-09.) This credibility finding is supported by the record. *See Bryant v. Astrue*, No. 09-1499, 2010 WL 3541097, at *5 (W.D. La. July 30, 2010) (the ALJ did not err by deferring to expertise of the VE, when VE reviewed the record and listened to Plaintiff's testimony). As such, Plaintiff's final claim that the ALJ committed reversible error by relying on the VE in finding that she is capable of making a successful adjustment to other work that exists in significant numbers in the national economy should be rejected.[30]

## III. CONCLUSION

For the foregoing reasons, the undersigned recommends that Plaintiff's Motion for Summary Judgment (Docket No. 11) be DENIED, that Defendant's Motion for Summary Judgment (Docket No. 14) be GRANTED, that the Commissioner's decision be AFFIRMED, and that this action be DISMISSED.

---

[30] As noted, Plaintiff also argues that the occupation of "counter supply worker" is not "viable" because it amounts to "just 28,000 jobs in the entire country." (Docket No. 12, at 16.) Although Plaintiff's argument is cursory, at best, the undersigned finds it persuasive. To begin with, "[t]he standard for work that exists in 'significant numbers' in the national economy is not a high one." *Read v. Comm'r , Soc. Sec.*, No. GJH-15-2684, 2016 WL 2610117, at *6 (D. Md. May 6, 2016) (citing *Lawler v. Astrue*, No. 09-1614, 2011 WL 1485280, at *5 (D. Md. Apr. 19, 2011)). In fact, the inquiry into whether a job exists in "significant numbers in the national economy" is one of "common-sense." *Dominguez v. Astrue*, 286 F. App'x 182, 188 (5th Cir. 2008). Here, 28,000 "counter supply worker" jobs in the national economy would amount to just 2,520 in the Texas. *See* https://www.census.gov/data/tables/time-series/demo/popest/2020s-state-total.html (Texas represents roughly 9% of the United State population). As Plaintiff points out, other courts have found similar numbers insufficient. (Docket No. 12, at 16 (citing *Adrienne W. v. Berryhill*, No. 3:17-CV-1218, 2018 WL 4403467, at *1, 3-4 (N.D. Tex. Aug. 24, 2018) (finding 33,000 (collectively) insignificant), and *Gretta H. v. Kijakazi*, No. 3:21-CV-3052-BT, 2022 WL 18107079, at *4 (N.D. Tex. Dec. 30, 2022) (finding 20,900 (collectively) insignificant)). In any event, as explained above the ALJ did not commit reversible error in relying on the VE in making her Step Five findings. *See supra* Part II.E.

Due to the detailed medical information summarized in this report, it is **ORDERED** that the Clerk shall file this Report and Recommendation under **SEAL**.

<u>**NOTICE TO THE PARTIES**</u>

The Clerk shall send copies of this Report and Recommendation to the parties who have fourteen (14) days after receipt thereof to file written objections pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of the Federal Rules of Civil Procedure.  Failure to file timely written objections shall bar an aggrieved party from receiving a de novo review by the District Court on an issue covered in this Report and, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court.

DONE at McAllen, Texas on September 13, 2023.

Nadia S. Medrano
UNITED STATES MAGISTRATE JUDGE